Wabdlaw, Ch.
delivered the opinion of the Court.
The plaintiff, in this suit, seeks to compel the defendants to deliver to him two slaves, Martha, and her child, William.
The following statement will exhibit the facts upon which the questions in the case depend. Mary Yereen died in 1833, leaving of force her will, bearing date July 17, 1832, which was admitted to probate, November 1, 1833. This will contained the following clauses. — “I give, devise and bequeath unto my friend, Mary S. M. Hardwicke, my negro woman, Phillis, together with her future issue and increase, trusting that the said Mary S, M. Hardwicke will fully comply with my wishes, respecting the said negro woman, Phillis, and her children which may hereafter be born; and it is further my will and desire, that the said Phillis should be allowed to keep with her, and have the services of her child, Martha, during the lifetime of the said Phillis; and at her death, I give, devise and bequeath unto my great-grand-daughter, Catharine LaBruce Walker, the said negro girl, Martha, together with her future issue and in *264 crease, under the same conditions,” &c: and the will contained other clauses, by which it was provided, that if either of the great-grand-children of the testatrix (of whom the said Catherine, and the two defendants were alive at her death) should die before being married, and before attaining the age of twenty-one years, the property bequeathed to such legatee should go to the survivors: and the said three great-grand-children were made residuary legatees. The said Catherine died about the year 1839, then aged about ten years, and unmarried. The executor of Mary Yereen included Phillis and Martha in his inventory of the estate, but does not mention them in his subsequent returns; nor does it appear that he further intermeddled with them. Martha was from two to six years of age at the death of Mary Yereen, and she has since had issue, the slave, William.
Mary S. M. Hardwicke died about the beginning of the year 1837, leaving of force her will, bearing date before Mrs. Yereen’s, viz,- — January, 23, 1831, but, apparently, not offered for probate until April, 1847, after the seizure of the slaves by defendants as hereafter mentioned: and this will makes the plaintiff executor and residuary legatee.. It appears, by the testimony of four witnesses, that Phillis lived, for some time after Mrs. Yereen’s death, with Mrs. Hardwicke ; but after her death, if not sooner, Phillis lived in a house in Georgetown, which was conveyed to her husband, Ben, a negro who had also formerly belonged to Mrs. Yereen, and hád passed into the ownership of Benjamin King, who paid taxes for him as a slave, but permitted him, in most respects, to exercise the privileges of a free negro. The plaintiff lived at Cape Romaine, and Ele-azer Waterman was his agent at Georgetown, but neither plaintiff nor his agent exacted any wages from Phillis or Martha, nor exerted any act of ownership over them. Their taxes, as slaves, were paid by the owner of Ben. The wishes of Mary Yereen respecting Phillis, with which she trusted her friend, Mrs. Hardwicke, would fully comply, appear pretty plainly by the will itself to be, that Phillis should be held in nominal servitude only: and the acts of the parties place this beyond doubt.
*265 The plaintiff, in his bill, which I suppose was sworn to, as an injunction was prayed for, states, “ that the said Phillis having been a favorite servant of her former mistress, and being now aged and infirm, and standing in need of the aid and services of some younger person, the plaintiff had permitted her, from the death of his sister, Mrs. Hardwicke, her last owner, after the example of his said sister, and in compliance with the testamentary wishes of Mrs. Mary Yereen, her former mistress, to pass her life in exemption from labor, with the attendance of her daughter upon her person, which he conceived himself bound in conscience and good faith to do, though a departure from his legal rights; and to this end he permitted them to live in George-towm, without any requisition upon the labor of Martha, further than necessary to the support of the mother and infant, child, also the subject of this suit.” On 31st March, 1847, the defendants took possession of the slaves, Martha and William, and now claim them either as bequeathed to them by Mary Yereen, or under their seizure, as set free by the tenant for life of Phillis, in violation of the Act of 1800.
From this state of facts arise the questions, whether the plaintiff has shown good title to Martha and William: and, if this has been done, whether he has forfeited his title by any illegal attempt, on the part of himself or those under whom he claims, to emancipate the slaves: and, on the whole, whether this be a proper case for the extraordinary jurisdiction of this Court.
The process by which the plaintiff deduces title to the slaves is, that the will of Mary Vereen bequeathed the services of Martha to Phillis, for the life of Phillis, — that a gift of the services of a slave is a gift of the slave, — that a gift to a slave amounts to a gift to the owner of the slave, — that Phillis is given to Mrs. Hardwicke, subject only to an ineffectual trust or recommendation, which the legatee may or may not execute, — that the gift of Phillis carries to the legatee Martha, as an incident, for the life of Phillis; and that plaintiff has all the title of Mrs. Hard-wicke. If one trusting to common sense could detect no flaw in this reasoning, he would still be reluctant to admit a conclu *266 sion, attained by adding deduction to deduction, and in utter conflict with the intention of the testatrix, and the policy of our law as to slaves. It is obvious that Mrs. Yereen, in her will, makes no direct gift of Marth, for the life of Phillis, unless it be to the residuary legatees, the defendants; and that she was expressing a desire, likely to be onerous and not beneficial to the legatee, when she requested that Phillis might be allowed to keep her child Martha with her. It is equally obvious, whatever in this matter may be the decisions of Judges, the province of whom is to declare the law as it exists, and not to determine upon the policy of the State; that it is against the course of legislation amongst us, that slaves should be practically released from the dominion and oversight of their masters, and be permitted to exercise the privileges of free persons. Of this, the Acts of 1800, 1820 and 1841, afford conclusive evidence. Nevertheless, if the reasoning of plaintiff be legitimate, we must adopt his conclusion, whatsoever may be our regret. As to the bequest of Phillis to Mrs. Hardwicke, the decisions of our Court of Errors in Carmille vs. Carmille, (2 McM. 454,) and McLeish vs. Burch, (3 Strob. Eq. 237,) establish the title of the legatee, if we may presume here, as in those cases was presumed, that it was the intention of the donor to bestow the beneficial interest, subject to a particular charge, upon the donee of the legal interest. These decisions, however, are not to be extended without grave consideration to other cases, not strictly within their doctrines. Our attention should always be directed to the inquiry, whether it was the purpose of the testator to give to the legatee the beneficial as well as the legal interest. The distinction pointed out by Lord Eldon in King vs. Denison, (1 V. & B. 272,) although nice is satisfactory. “ If I give, to A. and his heirs all my real estate charged with my debts, that is a devise to him for a particular purpose, but not for that purpose only. If the devise is upon trust to pay my debts, that is a devise for a particular purpose and nothing more; the effect of these two modes admits just this difference; the former is a devise of an estate of inheritance for the purpose of giving *267 the devisee the beneficial interest subject to a particular purpose ; the latter is a devise for a particular purpose, with no intention to give him any beneficial interest. Where, therefore, the whole legal interest is given for the purpose of satisfying trusts expressed, and those trusts do not in their execution exhaust the whole, so much of the beneficial interest as is not exhausted belongs to the heir; but where the whole legal interest is given for a particular purpose, with an intention to give to the devisee of the legal estate the beneficial interest, if the whole is not exhausted by that particular purpose, the surplus goes to the devisee, as it is intended to be given to him.” This distinction is recognized by our cases. In Carmille vs. Carmille, the distinction did not come under discussion, nor, I may remark in passing, could the doctrine of resulting trusts to the heir or next of kin, as to indefinite, inoperative or failing trusts, declared in Morice vs. Bishop of Durham, (10 Ves. 521,) be applied in that case, which turned upon a deed inter vivos. Judge O’Neall, in delivering the judgment, properly says, !i the case before us stands upon deeds executed, and taking effect, in the lifetime of the in testate, and the case must be considered as if the intestate was himself the complainant, asking that the deeds should be set aside; and a bill by one claiming to be relieved from his own act done in fraud of the law, could not be sustained.”
In McLeish vs. Burch, Ch. Caldwell, in the circuit decree, which, as is said in the ultimate decree, is not controverted on this point, remarks, “ whenever the expressions manifest an intention that the donee is not to have the beneficial enjoyment of the subject of gift, they will bind the conscience of the trustee, and will, in equity, effectually exclude his claim to any beneficial interest.” “ When a gift is conclusively and absolutely impressed with the character of a trust, the trustee will not, in any event, be entitled to the beneficial enjoyment, although the particular object of the donor’s bounty becomes unable to take it.” Again, in the final decree, he says: “ If the testatrix had not bequeathed the slaves to any *268 one, but required her executors to perform the trusts by paying them their legacies, and permitting them to live free of service or wages, except what might be sufficient to pay their taxes, it would have constituted a very different casebut, as the facts were, “ there was nothing upon which the doctrine of indefinite and void trusts, when no personal benefit is bestowed on the executor, can operate, so as to create a resulting trust in favor of the next of kin.”
In Fable vs. Brown, (2 Hill Ch. 398,) where the estate was given to slaves, without any direct bequest to the executor, Ch; Hareer. states the question, “ whether this can be regarded as a personal bequest to the executor, giving the property beneficially to him, and only depending on his friendship and good faith to deal with it as the testator recommends,” and comes to the conclusion, that the estate was not given to the executor, and that neither master nor- slave could maintain an action against the executor for the legacy given in the case. All of these cases, as the one before us, are without the operation of the Act of 1841.
The application of these doctrines to this case, is fatal to the plaintiff’s pretension, that the gift of the services of Martha to Phillis, for the life of Phillis, amounts to a gift of Martha for .the same term to the legatee of Phillis. The testatrix has not given, directly at least, any legal interest in Martha to Mrs. Hardwicke, and she intended for this legatee no beneficial interest in Phillis, much less in Martha. When Mrs. Yereen expressed the desire, “ that Phillis should be allowed to keep with her, and have the services of her child, Martha,” it was surely not her purpose to constitute Phillis proprietor of Martha, and a proprietor who could transmit title. The words of the will imply that some accommodation or indulgence, from Martha’s company and attendance, was designed for Phillis, as a personal privilege to a favorite servant; but first to convert this privilege into full title, and then to transfer it to Mrs. Hardwicke, is to change the whole substance of the bequest, both as to subject .and object. If the wife of my coachman, both slaves, should *269 become sick, during the casual absence of my neighbor, her owner, and I should write a note to his overseer, that the coachman might remain with his wife, and yield her any service; could it be pretended that my neighbor had thereby received my bill of sale of the coachman? Yet that case does not differ from the one before us in principle. It is not controverted, that a gift of the use of an inanimate chattel, or of the services of an intelligent or sentient chattel, is generally a gift of the chattel; for the use and services of the chattel included all benefit that property in it can afford, and imply the intention of the donor to convey the property. He is the owner, who is entitled to all the advantages and attributes of owner. But unless the donee be sui juris, and capable of exerting dominion and enjoyment, as he cannot be entitled to the use and services, he cannot take the chattel itself, to which these cohere. A bequest of $50 to. the horse of another, that the horse might be supplied with wholesome provender, would be barren to the horse and his owner, although a bequest to the owner for the use of the ■horse, might be good.
A slave, although a chattel, is also a person, and, to some extent, capable of the acquisition of property, for the benefit of the master. But a privilege attending the person of the slave, or a trust for him, or an executory contract made with him,, canno.t be judicially established, either for the slave or his master. Chancellor Harper, in Fable vs. Brown, presents the just view of this matter: “whatsoever chattels the slave acquires, he acquires for his master, and the master might maintain an action for them in the hands of a stranger. But an executory contract made with a slave cannot be enforced. No action could be maintained on a bond or note given to a slave.” The bequest to Phillis here, is a voluntary and executory contract that she may have the society and service of her child, and is not an assignable interest. In fact, the legal interest in Martha is given to the defendants as residuary legatees, and the recommendation that she might be allowed 'to attend and serve Phil-lis, is addressed to their benevolence and good faith. We con- *270 elude that the plaintiff has not shown title to the slaves claimed in his bill.
This view supersedes the necessity of a full consideration of the question, whether, if the plaintiff had title to the slaves, his practical emancipation of them did not subject them to seizure under the Act of 1800. If these slaves, when seized by defendants, were not in that condition of derelection by their proprietors, and irregular emancipation, intended to be prevented by the Acts of 1800 and 1820, it would be difficult to specify any case distinctly within the mischiefs and scope of the Acts; but we are restrained from any absolute determination on this point, which depends on the facts, by deference to the judgment of the Chancellor who heard the case on the circuit. The judgment of a Chancellor, when exercising the functions of a jury, and settling the weight of testimony, from the manner and character of the witnesses, is entitled to the same respect from an appellate tribunal, as the verdict of a jury. The Chancellor in this case decides, that the slaves were not in the predicament exposing them to seizure, and we will not reject, however we may distrust, his conclusion from the evidence.
If both of the questions discussed, as to the title and seizure, had been decided in favor of plaintiff, we should still have refused to him the specific delivery of the slaves. This remedy is peculiar to this Court, and is to be exercised with sound, judicial discretion. The plaintiff here seeks delivery of the slaves, not from their peculiar value to him which damages would not compensate, nor, indeed, for his own service, but for the accommodation of an old negro woman; and we should have left him to his redress at law.
It is ordered and decreed that the circuit decree be reversed and the bill dismissed.
Johnston and Dunkin, CC. concurred.